IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| KEENA SIMS, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF TOUSSAINT DIAMON SIMS AND ON BEHALF OF K.S.S, A MINOR CHILD, AND A.J.S., A MINOR CHILD | PLAINTIFFS |
| v. | Civil No. 1:20cv247-HSO-RHWR |
| CITY OF MOSS POINT; LANCEN SHIPMAN, BRANDON ASHLEY, JOHN DOES, AND UNNAMED INDIVIDUALS | DEFENDANTS |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT LANCEN SHIPMAN'S MOTION [35] FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY**

BEFORE THE COURT is Defendant Lancen Shipman's Motion [35] for Summary Judgment and Qualified Immunity. Plaintiffs have filed a Response [39] and Defendants have filed a Rebuttal [61]. After due consideration of the briefs, the relevant pleadings, the record, and relevant legal authority, the Court finds that Defendant Lancen Shipman is entitled to qualified immunity and that his Motion [35] for Summary Judgment and Qualified Immunity should be granted. The claims against Defendant Lancen Shipman, in his individual capacity, should be dismissed with prejudice.

I.  BACKGROUND

A.  Factual background

Based upon the uncontroverted record evidence, on August 8, 2019, two police officers with the City of Moss Point, Mississippi, observed a man they believed to be Toussaint Diamon Sims ("Sims") at a gas station in Pascagoula, Mississippi. Ex. [35-1] at 3. Sims was wanted by the Moss Point Police Department on felony warrants for aggravated assault, two counts of felony fleeing law enforcement, two counts of domestic violence/simple assault, and assault by threat. *Id.* In addition, he had previously led officers on a vehicle pursuit, where his vehicle was found to have a rifle inside. Ex. [35-2] at 3.

The two officers were transporting a prisoner, so they contacted another Moss Point police officer, Defendant Lancen Shipman ("Defendant" or "Shipman"), by radio, informed him of Sims's location, and requested that he respond to the gas station. Ex. [35-1] at 3. Because the gas station was actually located in Pascagoula, the Pascagoula Police Department was notified of Sims's location, and Pascagoula Officer Ernest Snyder also responded to the scene. Ex. [35-3] at 1-2. When Shipman and other officers arrived and confronted Sims at the gas station, he immediately fled in his vehicle and led officers on a lengthy, high-speed vehicle chase throughout Moss Point, reaching speeds recorded at over 120 miles per hour. Ex. [35-5] at 1. During the pursuit, Sims led officers through a primarily residential area, running stop signs and stop lights. Ex. [35-4] at 1. After blowing out a tire, Sims abandoned his car and fled on foot through the backyard of a house located on Second Street, in

Moss Point. Ex. [35-6]. Shipman and another police officer, Charles Ward, exited their vehicles and pursued Sims on foot, *id.,* and Shipman initially pulled out his taser to use in an attempt to stop Sims, Ex. [35-11].

At the time Sims exited his vehicle, Shipman did not see anything in Sims's hands, Ex. [35-5], but Shipman testified in his deposition, and home security camera footage confirms, that as Sims was running, he pulled a firearm out of the waistband of his pants, Ex. [35-2] at 4-7; Ex. [35-11]. Sims did not drop the weapon, instead carrying it as he ran. Ex. [35-11]. To Shipman, who was behind Sims, it appeared that Sims removed the weapon with his right hand and began to manipulate it with his left hand. Ex. [35-11]. Shipman testified that he believed Sims was "trying to chamber a round or take it off safety" with his left hand. Ex. [35-2] at 14.

Shipman testified that when he saw the firearm in Sims's hands, he shouted, "gun, gun, gun, drop the gun," both as a warning to Officer Ward and as a command to Sims. *Id.* Shipman believed that Officer Ward was immediately behind him on his right side, *id.*, but in fact, Officer Ward had taken a different route around the front side of the house in an attempt to intersect Sims's path, Ex. [35-9] at 2. At this point, Shipman drew his gun as well, because "after [Sims] pulled [the gun] out, refused to drop it and started manipulating the weapon, I felt he was going to fire on me." Ex. [35-2] at 13. "I [saw] him turn towards me, and he had a gun in his hand." *Id.* Shipman testified that Sims had turned and faced him as he attempted to jump a fence, Ex. [35-2] at 11-12, and Shipman fired in rapid succession at Sims,

3

*id.* Three of Shipman's shots apparently struck Sims, in his throat and his back. Ex. [35-3] at 8. Video evidence reflects that Sims dropped the weapon as he fell to the ground. Ex. [35-11].

Shipman's body camera footage shows Officer Ward arriving at about that time. *Id.* Ultimately, it was determined that Shipman had fired eight rounds, three of which struck Sims. Ex. [48-7] at 1. Shipman testified that he fired rapidly "until the threat was no longer a threat," which was when he saw that Sims's "gun flew up in the air." Ex. [35-2] at 9. After Sims fell to the ground, Shipman and Officer Ward pushed the weapon away from Sims. Ex. [35-9] at 4. The weapon had an extended magazine with a capacity of 15 rounds, with seven rounds remaining in the magazine, and one round in the chamber. Ex. [35-8] at 3. Officer Ward handcuffed Sims and called for an ambulance, Ex. [35-9] at 4, but unfortunately, Sims died at the scene from his wounds, Ex. [35-3] at 6.

The coroner's report revealed that a bullet struck Sims in the front of his neck, Ex. [47-8] at 2, indicating that he was facing Shipman when he was struck with that shot. Sims was also struck in his back. *Id.* The Mississippi Bureau of Investigation ("MBI") investigated the shooting and the Jackson County District Attorney's Office reviewed the findings and presented the case to a grand jury. Ex. [35-3]. The grand jury declined to indict Shipman. Ex. [35-13] at 1. Plaintiff has adduced no competent summary judgment evidence sufficient to create a material dispute of fact on the foregoing points. *See generally* Resp. [39].

B.   Procedural history

On July 30, 2020, Plaintiff Keena Sims ("Plaintiff"), both individually and as Administratrix of the Estate of Toussaint Diamon Sims, and on behalf of K.S.S., a minor child, and A.J.S., a minor child, filed suit against the City of Moss Point, Lancen Shipman in his individual capacity, Chief of Police Brandon Ashley, and John Does. The Complaint [1], brought pursuant to 42 U.S.C. § 1983, alleges that Defendant Shipman used unreasonable, unjustified, and excessive deadly force, in violation of Sims's rights under the Fourth Amendment to the United States Constitution. Compl. [1] at 1.

Shipman has filed the instant Motion for Summary Judgment and Qualified Immunity, asserting that he is entitled to qualified immunity and that his actions were objectively reasonable in light of clearly establish law. Mem. [36] at 2. Plaintiff opposes on grounds that Shipman violated clearly established law prohibiting the use of deadly force against a fleeing felon who did not pose a sufficient threat of harm. Mem. [40] at 27.

## II. DISCUSSION

A.   Legal standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Castera Robles v. Cayton*, 454 F. App'x 373, 376 (5th Cir. 2011). If the movant satisfies this burden, the nonmoving party must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). "A

dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (citations omitted).

"A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (quotation omitted). To show qualified immunity is not available, the plaintiff must demonstrate that the defendant's conduct was "objectively unreasonable in light of a clearly established rule of law." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). "A law is 'clearly established' if it is 'sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Qualified immunity gives defendants "breathing room to make reasonable but mistaken judgments," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011), and protects "all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

The qualified immunity inquiry involves two prongs: (1) "whether an official's conduct violated a constitutional right of the plaintiff"; and (2) "whether the right was clearly established at the time of the violation." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). If both prongs are satisfied, the court will then ask "whether reasonably competent officers would have known that their actions violated law which was clearly established at the time of the disputed action."

*Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). "[L]aw enforcement officers who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Id.* (citing *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001)). Whether a defendant's actions were objectively reasonable is not a question of fact for a jury, but rather a question of law for the court. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

"When an officer uses deadly force, its reasonableness turns primarily on whether 'the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others.'" *Wilson v. City of Bastrop*, 26 F.4th 709, 713 (5th Cir. 2022) (citing *Bazan ex rel. Bazan,* 246 F.3d at 493). Because police officers often have to make quick decisions in "tense, uncertain, and rapidly evolving" situations, courts must evaluate an officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hale v. City of Biloxi*, 731 F. App'x 259, 262 (5th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

B.   <u>Whether Shipman's conduct violated a constitutional right of Sims</u>

Plaintiff claims that Shipman violated Sims's Fourth Amendment right to be free from excessive force. Compl. [1] at 7. "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Inquiry into the reasonableness requirement balances the amount of force used with the need for that force under an objective standard. *Graham,* 490 U.S. at 395.

7

"[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner,* 471 U.S. at 11; *see also Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) ("[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others.") (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

Shipman testified that as he pursued Sims, he saw Sims pull out a firearm and that it appeared to Shipman that Sims was attempting to manipulate the weapon, as if to chamber a round or remove the safety. Ex. [35-2] at 14. Shipman believed that his partner, Officer Ward, was following him, and that he and Officer Ward were in danger given Sims's actions. *Id.* Additionally, Sims had just led officers on an extended, high-speed vehicle chase through a residential area, Ex. [35-4] at 1, and Shipman was pursuing Sims on foot through a residential area, Ex. [35-6]. Indeed, video reflects that two bystanders were outside on the front porch of the house as Sims ran through the yard. Ex. [35-11]. Shipman was also aware that Sims was wanted by the Moss Point Police Department on multiple felony warrants for violent crimes, and that he had previously been found with a rifle in his vehicle. Ex. [35-2] at 3.

An officer is permitted to take steps to protect himself, his partner, and the residential community when an armed suspect is running from police, especially if

he reasonably believes that an armed suspect is preparing to fire a weapon. *See Wilson*, 26 F.4th at 713; *Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 (5th Cir. 2016) (deadly force justified when suspect resisted arrest, ignored officer's order to stop, and reached toward his waistband); *see also Boyd v. Baeppler*, 215 F.3d 594, 601 (6th Cir. 2000) (deadly force justified when armed suspect fled and disregarded police warnings to stop); *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) (deadly force justified when suspect fled with a sawed-off shotgun and disregarded officer's command to stop).

In *Wilson,* officers were called to the scene after receiving reports that a suspect was brandishing a firearm. *Wilson*, 26 F.4th at 713. When officers arrived, the suspect fled, running towards officers, onlookers, and an apartment complex with his weapon, ignoring repeated commands to drop the weapon. *Id.* at 715. The Court emphasized that an officer "need not wait until a fleeing suspect turns his weapon toward bystanders before using deadly force to protect them," *id.* at 714, and that the officer who fatally shot the suspect "could have reasonably believed that the fleeing [suspect], who persistently held onto his gun against the officers' orders, presented a threat to his safety, [another officer]'s safety, and the safety of onlookers in the [apartment complex]," *id.* at 715.

Plaintiff argues that there are genuine issues of fact as to whether Shipman gave any warning for Sims to drop the gun prior to firing his weapon. Mem. [36] at 23. Specifically, Plaintiff contends that Officer Ward's testimony that he did not hear any warnings, combined with Shipman's claims that he did in fact give a

warning to drop the gun in a loud voice, creates a material fact question. *Id.* However, this by itself is insufficient to create a material fact question that Shipman gave the warnings. Officer Ward testified that instead of remaining behind Shipman, he ran around the opposite side of the house in an attempt to cut off Sims's escape. Ex. [35-6]. Although Officer Ward did not hear any warnings, police sirens are audible once Shipman first turns on his body camera audio; as Shipman returns to the police vehicles after the shooting to turn off the sirens, his body camera footage shows that he takes the route that Officer Ward had traveled. Mot. [35-11]. As Shipman comes around the house and nears the vehicles, in the general vicinity where Officer Ward would have been when Shipman gave his warning, the sirens from the police vehicles grow louder. *Id.* In sum, the fact that Officer Ward did not hear any verbal warnings does not by itself create a material fact question on whether they were given.

Regardless, even if Officer Ward's inability to hear Shipman's warnings is not clearly explained by the evidence, a failure to warn prior to shooting does not automatically mean the force used was excessive, nor does it make an officer's conduct objectively unreasonable. *See, e.g., Colston v. Barnhart*, 130 F.3d 96, 100 (5th Cir. 1997) (the court held that the totality of the circumstances should be assessed when making the determination of what is objectively unreasonable and disagreed with the plaintiff's argument that a failure to warn always makes an officer's conduct objectively unreasonable). While police officers may use deadly force if necessary to prevent escape of an armed suspect, "and if, where feasible,

some warning has been given," *Garner,* 471 U.S. at 12, officers are not always required to give warnings in "fast-moving" situations, *see Roberts v. City of Shreveport,* 397 F.3d 287, 295 (5th Cir. 2005) (stating officer not required to give a warning prior to shooting driver of a car that struck him).

Indeed, Courts in this Circuit have granted summary judgment in cases where officers failed to provide a warning prior to discharging their weapons. *See Mendez v. Poitevent,* 823 F.3d 326, 333-334 (5th Cir. 2016) (stating that summary judgment was appropriate where a federal agent shot the unarmed plaintiff as he fled, after the plaintiff had attacked the agent as he tried to arrest him); *Colston,* 130 F.3d at 100 (5th Cir. 1997) (summary judgment appropriate when defendant officer shot suspect without warning while suspect was running away, because the officer "had no way to know whether [plaintiff] intended to flee or inflict further injury or death on the officers"); *Estate of Wise v. City of Gladewater*, No. 2:17-CV-00788-RSP, 2019 WL 2302719, at *7 (E.D. Tex. May 30, 2019) (summary judgment appropriate when defendant officer shot the plaintiff without warning, when the officer believed the plaintiff had a weapon).

Thus, even if there is a question as to whether Shipman gave a verbal warning before firing his weapon, that question is not material because under the remaining undisputed facts it would not change the result. Under the undisputed facts of this case, due to the fast-paced, rapidly evolving scenario occasioned by Sims's own conduct, and because Shipman was chasing an armed individual whom he believed was manipulating his weapon in what he perceived to be a threatening

11

manner in a residential area while fleeing from police, Ex. [35-3], the Court cannot say that any failure to give a verbal warning before shooting would amount to an unconstitutional use of excessive force. *See Wilson*, 26 F.4th at 713; *Salazar-Limon*, 826 F.3d at 279; *Boyd,* 215 F.3d at 601; *Montoute,* 114 F.3d at 185.

C. <u>Whether the right was clearly established at the time of the violation</u>

Even if Plaintiff could establish that Defendant violated Sims's right to be free from an unreasonable seizure, she would still have to show that the right was "clearly established" at the time of Shipman's actions. *See Brown,* 623 F.3d at 253. For a right to be clearly established, Plaintiff must point to case law where a defendant officer was shown to have acted unreasonably under similar circumstances. *Hale,* 731 F. App'x at 264; *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1153, 200 L. Ed. 2d 449 (2018) ("Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."). Courts should not "define clearly established law at a high level of generality . . . This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna,* 577 U.S. 7, 12 (2015) (citations omitted). Thus, it must have been clearly established in 2019 that the Fourth Amendment prohibited Shipman's conduct in the specific situation he faced. *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 338 (5th Cir. 2020) ("Therefore, we must 'identify a case where an officer

acting under similar circumstances . . . was held to have violated the Fourth Amendment.'").

Plaintiff cites several cases to support her Response [39], but none present facts so similar to those here as to "squarely govern" the Court's qualified immunity inquiry. *See Kiesela,* 138 S. Ct. at 1153. Plaintiff first cites *Garner*, a case where the police shot an unarmed man as he fled. However, unlike the present case, the victim in *Garner* was not armed, was not manipulating a weapon, and did not turn to face police while holding a weapon. *Garner*, 471 U.S. at 3; Ex. [35-2] at 11; Ex. [47-8] at 2 (indicating that Sims was facing Shipman when he was shot). *Garner* is factually distinguishable in these respects.

Plaintiff also relies upon *DeLeon v. Bierman*, No. SA-07-CA-0751-FB, 2009 WL 107000080 (W.D. Tex. Nov. 17, 2009). There, defendant officers shot the plaintiff when he fled after being told to freeze. *Id.* at *2. The victim was holding what officers believed was a weapon, but actually turned out to be a bag of marijuana. *Id.* at *3. In denying qualified immunity, the court found it important that the defendant officer had "no reason to believe that DeLeon had committed any crime, not even a parking violation." *Id.* at 9. The facts here are quite different, as Shipman was aware Sims had several outstanding warrants for violent criminal conduct, was known to carry firearms, and had just led officers on a lengthy and dangerous high-speed pursuit through a residential area before fleeing on foot and then producing a weapon. Ex. [35-3].

Plaintiff next points to *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996), where officers heard gunfire and were told that the shooter was in a parked truck. *Baker*, 75 F.3d at 193. Police ultimately shot and killed the plaintiff's child, despite multiple witnesses affirming that the suspect did not take any actions towards the officer, barely even turning his head to have an opportunity to see the officer before he fired. *Id.* at 198. The court in *Baker* found it significant that the victim's injuries indicated that he was shot while facing away from the officer, *id.*, where here, at least one of Sim's injuries indicated that he was shot while facing Shipman, Ex. [48-7].

In *Graves v. Zachary*, 277 F. App'x 344 (5th Cir. 2008), the victim was attempting to commit "suicide by cop" when officers shot him. *Graves*, 277 F. App'x at 346. The Fifth Circuit found that a material fact question existed as to whether the second shot was necessary because there was a dispute as to whether the first shot incapacitated the victim. *Id.* at 348. Plaintiff cites the material disputes at issue in *Graves*, whether police ordered the victim to drop the gun and whether the successive shots after the first shot were necessary, as reasons to deny summary judgment here. Mem. [40] at 25-26. Neither of these are material issues in this case. Shipman says he warned Sims and Plaintiff has produced no evidence that plainly contradicts this; even if Plaintiff had, it was not objectively unreasonable for Shipman not to warn Sims under the fast-moving, dangerous circumstances of this particular incident. *See Colston,* 130 F.3d at 100; *Roberts,* 397 F.3d at 295; *Mendez* 823 F.3d at 333-334; *Estate of Wise*, 2019 WL 2302719 at *7.

Plaintiff further contends that "each round must be independently justified when multiple rounds are fired." Mem. [40] at 2. While this is generally true, courts have also held that if a police officer's decision to begin firing is justified, he or she need not stop firing until the situation is resolved:

> 'It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.' And the Court found that the threat had not ended precisely because the suspect 'never abandoned his attempt to flee.' The case would be different, the Court noted, 'if [the officers] had initiated a second round of shots after the initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up.'

*Malbrough v. Stelly*, 814 F. App'x 798, 806 (5th Cir. 2020) (citing *Plumhoff v. Rickard,* 572 U.S. 765, 777 (2014)).

Here, the unrebutted, competent summary judgment evidence establishes that Sims was fleeing from the police while manipulating his weapon, potentially chambering a round or removing the safety, Ex. [35-11], and that Shipman fired in rapid succession until Sims fell to the ground and dropped the weapon, at which point he no longer posed a threat, Ex. [35-2] at 9. The video evidence reveals that Sims never abandoned his attempt to flee, and never dropped his weapon until he was shot. Ex. [35-11]. Plaintiff cannot rely on this argument to avoid summary judgment.

Plaintiff next cites to *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019), where a suicidal teenager held a gun to his own head as he began walking into the woods, as police followed him. *Cole,* 935 F.3d at 448. The Fifth Circuit affirmed the district court's denial of qualified immunity because there were competing narratives

15

regarding issues of material fact. *Id.* at 447. Specifically, the parties disputed what the police knew before shooting the victim and whether or not the victim had pulled the gun away from his own head to threaten an officer with it. *Id.* at 455-56. That is not the situation here.

The final case upon which Plaintiff relies is *Lytle v. Bexar Cty.*, 560 F.3d 404 (5th Cir. 2009), but again, the facts are too dissimilar for comparison. In that case, the defendant police officer was involved in a car chase with a suspect when the suspect placed his vehicle into reverse, presumably in an attempt to ram his car into the officer's vehicle. *Lytle,* 506 F.3d at 409. To protect himself, the officer fired two shots, killing a passenger in the backseat of the vehicle. *Id.* at 408. The parties presented differing versions of the facts regarding how far away the car was when the officer began firing, which created a material fact issue on whether the car posed a threat at all. *Id.* at 416-417. That is unlike the present situation, where the video evidence clearly depicts that Sims was close enough to pose a threat to Shipman as he was carrying a firearm. Ex. [35-11]; Ex. [35-2] at 9.

In sum, Plaintiff has not pointed to sufficient authority establishing that it was clearly established in 2019 that Shipman's conduct violated the law under the specific circumstances he was facing. Moreover, the Court cannot say that Shipman's conduct was objectively unreasonable in light of the law that was clearly established in 2019. Based upon the facts that cannot be disputed and the law that was clearly established at the time, a reasonable officer in Shipman's position could have believed his actions were lawful. In short, Plaintiff has not carried her

summary judgment burden to demonstrate that Shipman's conduct was objectively unreasonable in light of clearly established law at the time. Shipman is entitled to qualified immunity.

### III. CONCLUSION

To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result. Defendant Shipman's Motion [35] for Summary Judgment should be granted.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Lancen Shipman is entitled to qualified immunity and his Motion [35] for Summary Judgment and Qualified Immunity is **GRANTED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the claims of Plaintiffs Keena Sims, Individually, and as Administratrix of the Estate of Toussaint Diamon Sims and on behalf of K.S.S, a minor child, and A.J.S., a minor child, against Defendant Lancen Shipman in his individual capacity, are **DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED**, this the 22nd day of March, 2022.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE